198 So.2d 579 (1967)
Margaret Ann DANIELS
v.
MORGAN & LINDSEY, INC.
No. 44438.
Supreme Court of Mississippi.
May 8, 1967.
*580 Kelly McKoin, Biloxi, for appellant.
Ben H. Stone, Eaton, Cottrell, Galloway & Lang, Gulfport, for appellee.
JONES, Justice.
This case was first tried in the County Court of Harrison County. At the conclusion of the evidence, the judge instructed the jury peremptorily to find for appellee. On appeal to the circuit court, the case was affirmed. It now comes here and we are affirming.
This is a regrettable case in that the appellant slipped and fell, receiving a serious and permanent injury. However, we cannot permit our sympathies to dictate decisions.
There are only two assignments of error: (1) That the court erred in granting the peremptory instruction; and, (2) that the court erred in admitting in evidence a sheet of instructions furnished by the manufacturing company in connection with the products used by appellee in cleansing and dressing of its floors.
On July 11, 1964, about 1:00 p.m., appellant entered appellee's store to buy some shades. She turned to the right, down the aisle toward the back where the shades were. She slipped about midway down the aisle, one foot going forward and the other backward. She couldn't stop her fall and went down on her right knee which she heard pop when it hit the floor. After falling, she looked in front of her. She said the floor was heavily waxed. The reason she concluded this was that the floor was "shining, slick, highly polished and glittering like." From this, she assumed and stated the floor was heavily waxed, and that it was "clear like a mirror." As far as she could tell, the floor was clean. She did not notice any foreign substance or debris.
Her husband and son were in the A & P Store near by. She testified her daughter-in-law was in the store buying something for the children, but her daughter-in-law did not testify. At the time, plaintiff was wearing heels about one and a half inches high which she imagined were about the size of her second finger and on which there were attached steel tips. When asked whether the floors were approximately the same as in the courtroom where the case was being tried, to-wit: asphalt tile, appellant answered, "I imagine they were."
The next witness for appellant was her husband, Leroy Daniels, who testified that he and his oldest son were in the A & P Store, about 1:00 p.m. on July 11, 1964. A colored man came and told him that his wife was hurt. He left everything and went to her. He slipped twice going into the store and caught on the counter, not far from her. He also said that the floors looked like they had just been wet, that they were "slick." He could see her prints where she slipped on the floor. He thought the left foot slipped about two, or two and a half feet, and he indicated about how long the strip was for the right foot. He denied that he was running in the store, but when asked, "You were pretty much in a hurry?" His answer was, "Well, wouldn't you be, if your wife was hurt?"
His opinion was there was wax on the floor, based on the fact the floor was glittering, and there were marks where the heels had slipped. He said he could tell there was wax on the floor because "you could see it, it just looked slick, it looked greasy like." He saw no other objects on the floor. The floor looked clean to him.
Appellant had been in the same store previously and the floors were always clean *581 and well polished. On this occasion the floor was clean, and the only complaint she had was too much wax.
Leroy Daniels, Jr., appellant's son, was with his father at the A & P Store. He said they were told of the accident, and "we run over there." His father was in front of him. The son said, "Well, he went through the door and he liked to have slipped down as he went through the door  right in side." This witness said that the colored man drew his attention to the floor where the "groove marks" were on it. It looked like heavy wax  it was "shining in other words."
He testified there were two marks  one where the heel slipped forward and one where the heel went backward.
Objection was sustained to this because of the conclusion that the heel slipped.
On cross-examination, when asked if he had a chance to observe these floors and look at them, his answer was, "Yes, sir; I couldn't swear if there was wax on them or not, but they were shining and slippery."
Here appellant rested. On motion for a peremptory instruction the county judge held the evidence required a response by appellee.
Appellant made no complaint as to the floor, its type, installation, or anything connected therewith, except the shining and slippery condition which she and her husband attributed to wax. The son said he could not swear it was wax even though he was the one who called the mark where his mother fell a "groove."
There was no evidence that anybody examined this so-called groove. If there was an accumulation of material of any sort, the edges of the groove, if it were a groove, would have shown it.
Appellee introduced William L. Gary, its assistant manager, whose duty it was to maintain the floor. The flooor was asphalt tile, a common type such as was in the courtroom where the case was tried.
This witness had had three years with the University of Iowa as a floor maintenance man, whose duties dealt with stripping and sealing about every type of floor they had. He also dressed, waxed and maintained the floors for the University. In addition, the witness had been with appellee for about one year, and had been at the store in Gulfport for three to four months at the time of the accident. It was his duty and responsibility to take care of the floors. They were swept daily, sometimes twice a day, depending upon the amount of traffic and whether debris had spilled or dropped on the floor. Any debris spilled or dropped on the floor was removed immediately by him. Once a month they worked, "stripping and dressing the floors." In that process they used a soap detergent known as Miko diluted with water. This was spread on the area for ten to fifteen minutes, after which it was mopped. Then rinse water was used until all traces of the soap were gone. They tried to do this once a month and in that way keep any wax buildup from accumulating. The process is stripping the floor and not just wet mopping it. The dressing they put on the floor was known as "Sole Grip" with a non-slip finish. It was applied by the witness personally in thin layers, or coats, with a regular cotton mop. He did the work personally to make sure that substances would not go to the counter board and so foot traffic would not cause a buildup over the counter edge. Before the Sole Grip was applied the floor was allowed to dry. He had three high school boys who came and helped scrub the floors at night, under his strict supervision; but they did not apply the dressing, that was done by the witness himself. The store had a set of instructions relative to the dressing used which sheet was stapled to the wall where the janitorial supplies were kept. He did not buff the floor because the dressing was a self-polishing dressing which caused a halfway gloss. Regular walking on the floor and general sweeping kept the gloss. It was what they said is "self-polishing."
*582 At this point, the defendant introduced a sheet which tells of this particular chemical, its outstanding properties; that it complied with and exceeded all laboratory test requirements under federal specifications, and more than meets the requirement of the rubber manufacturers association and with directions as to how to apply it. Objection was made to the introduction of this sheet issued by the manufacturers of Sole Grip and Miko. The court overruled the objection to its introduction, and we think properly so.
The floor was prepared as herebefore mentioned on July 6, just five days before the accident involved. The floors had been stripped and redressed with Sole Grip under the procedure outlined. This was done at night so the floor would have the entire evening and night to dry.
Mr. Gary testified that usually every morning he walked the entire floor space of the store, plus making morning inspection which gave him a chance to examine anything that might be out of line, like an empty box on the floor or any hazard that would be on the floor. He did this on the morning after the last dressing and the surface appeared to be hard and nonslippery. He tested it for slipperiness by shuffling his feet in two or three different spots throughout the store, and found no slipperiness. He also observed the floor on the mornings of July 8, 9, and 10 during the regular store hours. It was his duty to maintain a steady policing of the area, and nothing had been discarded on the floor which might have caused an accident. He never found any slippery spots or anything on the floors. He checked all of the floors, since he had to make reports in the morning. He testified there was not a lot of wax on the floors because he had stripped the floors that Monday evening, and then put one general layer of Sole Grip on it. On the morning of July 11, 1964, the date of the accident, he walked around and observed the floor of the store and found no slippery spots and debris. Everything had been thoroughly swept. The store opened at 9:00 a.m. He estimated that on the day of the accident, between 9:00 a.m. and the time appellant received her injuries there were between 100 and 150 people who had walked over the area where Mrs. Daniels fell. He was in the stock room at the time of the accident. A few minutes after she had fallen he came to the area and they were taking her to a doctor. At that time he checked the area where the accident happened to see if there was any debris. He found none and slid along the floor to ascertain if he could find any slippery spots, which he could not. He walked through the entire aisle, testing it for slipperiness, and then checked in the general vicinity. He said there were no broken tiles, and no debris that he could see that she might have stepped on and slipped, and there was no accumulation of wax in the area. The area was lighted by fluorescent lights that ran parallel with the aisles, and there was a light above the card rack The lighting was good  no bulbs out or anything in that area. It was his job to check these also. During the three or four months he was at the store he heard of no one slipping or falling in the store, and had no complaints by anyone of their having slipped or finding the floor slippery. The accident was on Saturday and from approximately 1:30 p.m., after the accident to closing time, he observed the flow of traffic. Saturday was a busy day, and he observed the floor traffic while keeping an eye for falling debris or anything that might be misplaced or laid on the floor, and for shoplifting. He estimated that between approximately 1:30 p.m. and 6:00 p.m. when the store closed, two to three hundred more people walked over the area where Mrs. Daniels was alleged to have fallen.
Mr. Wagespeak, sales representative for the manufacturer of Miko and Sole Grip had been employed for a period of four years. He was on one of his routine calls to Gulfport on June 29, 1964, twelve days before the accident. Morgan & Lindsey was using his products and, as was his duty *583 when he was there, he inspected the floors and testified he found them in safe condition. He found no wax accumulation or buildup. He considered the floors safe at that time without any excessive amount of wax. Sole Grip and Miko are one of the oldest lines of this particular type.
His testimony was that the application of these substances to the floor made them less slippery and his testimony was based on his knowledge of the product and training with the manufacturer. The product is recommended for use on asphalt floors. It is used by a number of chain stores throughout the country, some of which are Woolworths, J.J. Newberry, Western Auto, Auto-Lec, T.G. & Y., Morgan & Lindsey, Shainberg, Kress, and Kent, and is approved by the underwriters laboratory as to slip resistance.
Mrs. Averine Mellander was an employee of the company who was working on the day of the accident. She was about 15 feet away when she heard Mrs. Daniels fall. She went immediately and asked if she was hurt and she (Mrs. Daniels) said she was. Mrs. Mellander then went to get some of her superiors. On returning, she observed the floor, looking to see if there was anything to cause her to fall. The witness said there was not anything on the floor, and that the floor was all right and in good condition and not slippery. She further testified that she tested it to see if it was slippery. This was immediately after the fall. She also said there was no wax accumulation. She had been in the store in Gulfport for approximately five and a half years and had never heard of anyone falling in the store, nor of anyone slipping. The lighting where appellant fell was good. Mrs. Daniels had high heel shoes with about a two inch heel with steel plates. The heels were real small at the bottom, a little larger than a pencil. She noticed a mark on the floor and figured that Mrs. Daniels must have just slipped and that was the reason she inspected the floor. She estimated the people traveling over the aisle that morning and that afternoon at approximately the same figures that have hereinbefore been stated.
Mrs. Eula Berry, another employee of the company, was told somebody had fallen and went to the scene. She saw the shoes heretofore mentioned. In her three years of working for the appellee she had not heard of anybody falling or slipping on the floor.
Mrs. Evelyn Scarborough was employed by appellee as "floor lady," her duties being to see that all of the work is carried out on the floor and required ordering done. She walked the floors ever so often. She observed the condition of the floors and, if she saw an obstacle on the floor, she saw that it was removed right away. This she was instructed to do. Somebody came to the register and told her that Mrs. Daniels had fallen. The witness immediately went to her to try to help. She and the other girls checked the area where Mrs. Daniels had fallen to see if there were any foreign objects that would cause her to fall and did not find any; the floor was clean. There was not anything that would cause anyone to fall, and it was in good condition. She and some of the others tested the floor for slipperiness by using their heels and their feet. She said it was not slippery to her and that she wore high heels at all times. She estimates the number of people walking over the area in the neighborhood of the figures heretofore mentioned. After three and one-half years at the Gulfport store, she had never heard of anyone falling in the store. The lighting was real good. She said that just as a precaution the store required her to check the floors at one time or another every day. This was not because anyone had fallen, nor was it because it was slippery. It was a precaution that the store required. She testified that every time she tested the floor it was in a safe condition, and she tested it every day.
At this point, both sides rested and a request for a peremptory instruction for appellee was given.
*584 Appellant depends on such cases as Moore v. Winn-Dixie Stores, Inc., 252 Miss. 693, 173 So.2d 603 (1965), in which the injured party slipped on a banana peel. The peeling was all smashed like horses had been running across it and covered an area four to five feet square. It was shown that the peel had been smashed and appeared to have been there a long, long time. It was black.
Patterson v. Sayers, 223 Miss. 444, 78 So.2d 467 (1955) was also cited by appellant. In that case the spot in the lobby where the lady fell was considerably darker than the adjoining floor and covered a space of some three or four feet. This Court said that it was a fact she fell because she slipped on the floor, and that it was undisputed she fell because of the condition of the floor. She and others testified that the place where she slipped and fell was a different color. The heel of her shoe cut a groove into whatever substance was on the floor. The Court said the jury concluded that those who worked the floor had no special training in that work and often the floors were not properly waxed and buffed. The Court held that there were other reasons and details where reasonable men could conclude that reasonable diligence and care to have the lobby in a reasonably safe condition had not been exercised.
In Seymour v. Gulf Coast Buick, Inc., 246 Miss. 805, 152 So.2d 706 (1963), the injured party testified that he saw oil on the floor on which he slipped, and it was shown that at the pit into which appellant slipped the company had maintained a chain as a guard, but it had been removed. There our Court held it was a question of fact for the jury.
Appellant also in argument relied upon the case of Gulf Hills Dude Ranch, Inc. v. Brinson, 191 So.2d 856 (Miss. 1966). In that case there was testimony that other people had slipped in the very spot where appellee fell; that the tile floor was slippery, particularly a small area where appellee slipped. This Court held the proof of the appellant was insufficient to show what was actually put on the floor or how it was applied, since appellant failed to call as a witness the person who was in charge of the actual waxing of the floor.
We consider all of these cases as distinguishable from the case at bar.
It is settled law that appellee would owe to appellant, an invitee under the evidence here, the duty to exercise reasonable care to provide a reasonably safe place for the appellant to be while she was exercising reasonable care, and it is equally well settled that appellant is not an insurer of the safety of the people entering his place even as invitees. The issue in this case is not injury nor danger, but negligence proximately causing or contributing to the injury. The doctrine of res ipsa loquitur would not apply.
We agree with the trial judge who stated, "The evidence is wholly insufficient to point any degree of negligence whatever to defendant."
We believe this case to be governed by the cases of Daniel v. Jackson Infirmary, 173 Miss. 832, 163 So. 447 (1935), and Oliver v. American Republic Finance Corp., 246 Miss. 829, 152 So.2d 705 (1963).
It must be remembered in this case the only evidence as to the accumulation of wax was the testimony of appellant and her husband, which testimony was based upon the fact that the floor was shiny and slippery. In one place the son asserted there was a "groove," but it was not shown there was any substance on the side of this "groove" and the evidence clearly indicates to this Court that what was there were marks only, made by the heels of the appellant when she so unfortunately fell. In fact, her son, who called it a groove, said he could not swear there was wax on the floor.
In the Daniel v. Jackson Infirmary case, a patient walking from her room in the hospital fell and broke her arm. She *585 charged she fell solely because of the highly polished, slippery and dangerous condition of the waxed linoleum-covered floor. The linoleum was regulation Armstrong battleship linoleum of the same type and character used at stores and office buildings, and other public buildings, and was installed in the customary and proper manner. It was regularly cleaned and waxed each week in which process floor wax was used which was recommended by the manufacturer of the linoleum. It was shown the waxing was carefully done and the finish thereof was left in the manner directed by the manufacturer. That although this linoleum had been on the floor for about eight years and had been regularly cleaned and waxed as aforesaid in the daily use of numerous people, no previous injury had ever occurred from the use of the floors of the building. Judge Griffith in writing this opinion said that while it was not denied that there was some inharmony among the numerous cases dealing with the subject all are in substantial accord upon the rule that the owner, or person in control of a building, such as here, must exercise reasonable care to so construct and maintain the floors therein so that they may be reasonably safe for those who have a right to use them, when and while the users are themselves exercising reasonable care. Also, that the doctrine of res ipsa loquitur has no application to such cases when it appears the danger complained of is one which is entirely open and visible. All agree that the proprietors are in no sense an insurer of safety. It was also there held that the proprietor might use the proper and customary cleaning and polishing substances or materials on the floor when properly and carefully applied in the usual and customary manner, leaving no spots or pools of water, oil, grease, or wax, or other substance which would leave particularly dangerous places on the floor, as distinguished from the dull finish here. It was also stated that the test is not danger, but negligence, and negligence is the failure to take such reasonable care as should be taken by experienced and prudent men.
This Court there held that under the facts and law announced there was no liability on the part of the hospital, and the case was affirmed.
We call attention to the fact that here there is no question as to the construction or type of floor. In fact, it was shown it was asphalt tile floor as is used in many buildings and was actually used in the courtroom in which this case was tried at the time it was being tried.
The Oliver case followed the same rule, and we believe it is sufficient to quote from the syllabus of that case:
"Business invitee who entered company's office, fell because feet slipped out from under her, and claimed to have noticed after falling that floor had been recently polished and was very slippery could not recover from company which had used customary polishing material, did not allow unusual amount of wax to accumulate, and showed that on day of fall, some 50 or more other persons walked over floor without mishap."
We are of opinion that appellee not being an insurer as heretofore stated and res ipsa loquitur not applying met the burden of showing that it had exercised reasonable care to make its floors reasonably safe for those who had a right to use them and were themselves exercising reasonable care in their use. The case is affirmed.
Affirmed.
ETHRIDGE, C.J., and PATTERSON, INZER, and ROBERTSON, JJ., concur.